

AFFIDAVIT OF JANE DOE I

I, Jane Doe I being duly sworn deposes and says as follows:

1.    I am the plaintiff in this lawsuit.

2.    On November 6, 2000, I was sexually assaulted by Officer Daryel McCrorey, at my home located on Boothbay Street, in the City of Hartford.

3.    At the time of the assault Officer McCrorey was on duty in full uniform operating a marked cruiser.

4.    Prior to coming to my house Officer McCrorey called me and indicated that he wanted to talk to me.

5.    I told him that I did not have time to talk to him and hung up the phone.

6.    I was waiting for a friend when McCrorey arrived.

7.    Officer McCrorey began banging on my door for a approximately ten minutes.

8.    I could see it was police officer when I looked out of the window I saw a police car on my street in front of my house.

9.    I did not know whether it was Officer McCrorey or another officer.

10.   I would not have opened the door if it was not a police officer at my door.

11.   I thought the officer must have been there on official business because he was driving a cruiser and banging on my door for such long time.

12.   As soon as I opened the door Officer McCrorey pushed his way into my house.

13.   He immediately pushed me on the coach and then took off my clothes.

14.   I did not fight him as hard as a normal person because he was a police officer and I did not know what he was try to do.

15.   After he started disrobing me I tried to fight back.

16.   He held me down with one hand and made a call on the radio and said he was on Tower Avenue and Blue Hills followed by the number 17.

17.   I was unable to prevent him from taking my pants off because Officer McCrorey is too big and too strong.

18.   Officer McCrorey then began performing oral sex on me.

19.   During the course of the assault one of Officer McCrorey's belt loop was torn off.

20.   After the assault, Officer McCrorey sat on plaintiff's floor sucking his thumb saying I did not doing nothing wrong.

21.   I told him that  he did something very wrong.

22.   Officer McCrorey then offered me $200 to not report the incident.

23.   I told McCrory to leave as he was leaving my friend was coming in.

24.   I told my friend about the incident.

25.   She did not want me to report it because she feared for my safety.

26.   Later in the day, while I was still with my friends Officer McCrorey drove in front of my house and stopped.

27.  He again offered me $200 to not report the incident.

28.  I again refused any money.

29.  Officer McCrorey told me that know one would believe me if I reported him because he

is a police officer.

30.  I reported the incident later in the day to a Hartford detective I know.

31.  Officer McCrorey had answered a previous 911 call at my house.

_Jane Doe_
Jane Doe I

Subscribed and sworn to before me on this ___ day of November, 2003.

_____
Notary

KHRYSTELLINA KHENG
*NOTARY PUBLIC*
MY COMMISSION EXPIRES 08/00/2007

3

B

1  sent to someone for a finalization.

2       Q    Was that done in this case?

3       A    No.  This was not done in this particular case.

4       Q    Can you tell me why it was not done in this

5  particular case?

6       A    In this particular case, it was a special

7  investigative report that was completed, which this was an

8  investigation that started out with a radio.  And as part of

9  the police procedures, this is the way it is handled

10  according to some rules and specs there.

11       Q    Well, you indicated a minute ago that it would

12  constitute a crime for an officer to lie on a police report

13  under oath, correct?

14       A    Yes.

15       Q    And you also indicated that if a police officer

16  lied under oath in a police report, a sworn police report,

17  that you would refer him for prosecution.  Is that correct?

18       A    You asked, I believe -- maybe we can have -- could

19  you please repeat the question?  Maybe I understood

20  something differently.

21       Q    Okay.  My question is:  If you were aware of an

22  officer making a false report in a police -- a false

23  statement in a police report, would you refer him -- that's

24  sworn to, would you refer him for prosecution?

25       A    In this particular case, there is rules and

1  procedures under the code of conduct that govern that.  So

2  the first line of -- the first line of what we would do is

3  to follow the code of conduct and to prefer charges that

4  way.

5      Q     And even if it constituted a crime, you would not

6  prefer the charges; you would just simply go through the

7  code of conduct?

8      A     It depends on what the circumstances were.

9      Q     Okay.

10     A     My last understanding of code of conduct is when

11 it could be used, we were to utilize the code of conduct.

12     Q     So, in other words --

13     A     And if it was something that was criminal, an

14 offense such as an officer going in and burglarizing, doing

15 something like that, it was to go to -- the whole

16 investigation was to be done concurrently with the police

17 department, but it would go to the State's Attorney's office

18 as well.

19     Q     So is it fair to say that an officer who makes a

20 false report of an incident in a sworn police report is

21 simply referred to the code of conduct even though he could

22 be arrested?

23     A     Initially an officer that makes a false entry into

24 a police report, there is an investigation that is -- and as

25 part of that, we look at the code of conduct.

1    A    I don't know.  I don't understand the question.  I

2    honestly don't know.

3    BY MR. SPEARS:

4    Q    Let's try to -- can you tell me what you don't

5    understand about the question?  Maybe I can rephrase it.

6    A    It has been several years since I have been out of

7    the police department.  I don't remember the particulars.

8    And when I walked out the door, I left it behind me.

9    Q    So you don't know whether or not it was

10   discretionary with you as chief of police, acting chief of

11   police, whether or not an officer who made a false statement

12   in a sworn police report is prosecuted or not?

13   A    What I shared is that if an officer makes a false

14   entry in a police report, the first line of what has to

15   happen, according to the policies and procedures, is you

16   look at the code of conduct, and if there is something that

17   fits it within the code of conduct, you start with that.

18   Q    And what circumstances would take it out of the

19   code of conduct if you could fit it within a section of the

20   code of conduct?

21   A    There were some, but I just don't remember,

22   because I would have to look at the code of conduct and be

23   most familiar with it, and I'm just not anymore.

24   Q    So is it fair to say, based on what you have

25   previously testified to, that an officer can commit a crime,

1     that being a false statement in a sworn police report, and

2     not be prosecuted?

3          A     I'm sorry, I don't understand you.

4          Q     My question to you is:  Is it discretionary

5     whether or not to prosecute an officer who has lied in a

6     police report?

7          A     I would need to know what "discretionary" means.

8     What do you mean by "discretionary"?

9          Q     Up to you as acting chief.

10         A     If an officer commits a violation, and it is in

11    the code of conduct, we look within the code of conduct.

12    And if it is something that fits, then we prefer the code of

13    conduct.

14         Q     Okay.  Even if it also constituted a crime?  In

15    other words, even if the action of the officer constituted a

16    crime, but fit within the code of conduct, you go to the

17    code of conduct first?

18         A     If the officer committed a crime, as you say, then

19    he would be subject to the laws just like everyone else.

20         Q     And is it a --

21         A     And if he committed something that fell under the

22    code of conduct of the police department, then he is subject

23    to that.

24         Q     Are there crimes, criminal acts, that fit under

25    the code of conduct?

1    A    The current code?  I don't remember.

2    Q    You have it in front you.

3    A    I don't think this is the whole code of conduct.

4  It was much thicker than this.

5    Q    Is it your testimony that you don't know whether

6  or not --

7    A    Yes, there is.  There is a class that says

8  termination.  It says "class," and penalty is termination.

9    Q    Right.

10    A    And then he would also be subject to further

11  investigation.

12    Q    My question is:  Is an officer who has committed a

13  crime subject to -- strike that question.

14        Is an officer who has committed a crime and who

15  has been referred to the code of conduct exempted from being

16  prosecuted criminally?

17    A    No, he is not.

18    Q    Okay.  And is an officer who makes a false report

19  in a sworn police report, false statement in a sworn police

20  report, prosecuted for the criminal act?

21    A    When an officer makes a false police report, there

22  is a code of conduct.  As part of the policies and

23  procedures, we follow the code of conduct.  Or we did at

24  that time.

25    Q    Okay.

1      A      I don't remember.

2      Q      Do you recall whether or not Officer McCrorey --

3    well, strike that question.

4            In the code of conduct, Section 2.10 indicates

5    that there is three levels of punishment, correct?

6      A      Yes.  It has an E, G and an I after it.

7      Q      Okay.  And does the E, G and the I indicate

8    different levels of punishment?

9      A      Yes.

10     Q      And could you tell me why there is the disparity

11   between the E, G and the I in this particular situation?  In

12   other words, why there is no F?  Why have we skipped over F

13   as opposed to going in order?

14     A      No, I can't.

15     Q      Okay.  And I is a level of punishment that would

16   be available to you in recognition of knowingly and

17   willfully making a false entry in any departmental or other

18   official report or record?

19     A      Yes.  It says E, G and then I.

20     Q      In other words, Officer McCrorey could have been

21   terminated?

22     A      As I recall, my understanding was they looked --

23   whoever was doing the investigation looks at his prior

24   performance, they look at his discipline.

25     Q      I'm not asking that question.  I'm simply asking,

1  under a violation of 2.10, could Officer McCrorey have been

2  terminated?

3      A    Here it says 2.10, you can have E, G or I.

4      Q    And is I termination?

5      A    Yes.

6      Q    So one of the possible penalties he could have

7  received was termination?

8      A    According to this document, yes.

9      Q    Now, in terms of what you do when a person is

10  disciplined, is there any follow-up of the person after

11  they're disciplined in light of the discipline?  In other

12  words, are they looked at any more carefully because they

13  have been disciplined?

14      A    I don't know.

15      Q    Okay.  In other words, what I'm asking is when you

16  issued this discipline, did you follow up with talking to

17  any direct supervisor of Officer McCrorey and asking them to

18  do anything special in terms of supervising him?

19      A    Did I?

20      Q    Yes.

21      A    No.

22      Q    Okay.  Are you aware if anybody did?

23      A    I don't know.

24      Q    Okay.  Why did you feel that suspension -- why did

25  you agree with the findings of the investigator that

1    A    I think it was around '99. Chief Croughwell never

2    really went out -- there was just a mess there, so that's

3    why I can't recall dates. It was just -- the date when

4    Croughwell -- it was decided that he wasn't coming back.

5    There was a lot of stuff.

6    Q    But certainly by the time you issued the letter to

7    Mr. McCrorey meting out the discipline, you were acting as

8    chief at that point?

9    A    Yes.

10    Q    Okay. Now, you could have made a change in the

11    decision that was made at any time prior to issuing that

12    letter, correct, if you thought it was inappropriate what

13    was being done, while acting as chief?

14    A    I don't believe I could have in those cases.

15    Chief Croughwell, who was the chief, and -- he and Officer

16    McCrorey and the department advocate had already agreed upon

17    a particular amount of days.

18    Q    So you're saying that Chief Croughwell had

19    previously agreed prior to you issuing the discipline?

20    A    Through the department advocate, yes. And all I

21    was doing was --

22    Q    Carrying it out?

23    A    Yes, sir.

24    Q    And is that true of the lead-up to the discipline,

25    all the activities leading up to the discipline, in terms of

1    the chief being in control at that point in time?    In other

2    words, Chief Croughwell was the chief of police at all

3    points in time prior to you issuing that letter to McCrorey?

4    I'll withdraw that.    It's probably not a good question.

5            A    I don't know.

6            Q    Do you remember how long before issuing the letter

7    that you assumed the role of acting chief?    I'll try to find

8    the letter to help you.

9                    MR. DAIGLE:    Off the record.

10                    (Discussion off the record.)

11                    THE WITNESS:    Could you repeat the question?

12                    (The question was read by the court

13            reporter.)

14            A    The letter is dated in July, and I was acting

15    chief in July of 1999.

16    BY MR. SPEARS:

17            Q    Okay.    And is it fair to say that Chief Croughwell

18    took medical leave about a month prior to that, in June of

19    1999?

20            A    Yes.

21            Q    Okay.    And, in fact, I'll show you a document that

22    I'll ask to be marked, which is an affidavit of Chief

23    Croughwell.

24                    (Plaintiff's Exhibit 7 was marked for

25            identification.)

1    chief of police, you would have reviewed the entire

2    disciplinary file, correct?

3        A    Yes.

4        Q    And did you do that?

5        A    Yes.

6        Q    Okay.  And why did you do that?

7        A    It's standard operating procedure to review it.

8        Q    Well, I thought you indicated that you had no

9    choice but to issue you the agreed-upon discipline, correct?

10       A    That is correct.  I said the discipline was agreed

11   upon, but I still read the documents.

12       Q    You still read it?

13       A    Yes, sir.

14       Q    And did you agree or disagree with the discipline

15   that was meted out?

16       A    I agreed with the discipline that was meted out.

17       Q    Okay.  And you did indicate that you made a

18   finding that Officer McCrorey issued a false statement in

19   his police report, correct?

20       A    Yes, sir.

21       Q    Okay.  Now, in terms of supervision, do you know

22   what department or division, excuse me, that McCrorey was

23   assigned to at the time of the discipline?

24       A    No.

25       Q    Is there any document that would refresh your

1    according to that paperwork, I went from operations support

2    to operations to chief of police, so --

3         Q    To your knowledge, was there ever an investigation

4    directed at how the radio was recovered in the suspected

5    drug dealer's house?

6         A    I don't recall.

7         Q    Okay.  Did you ever make a determination of how

8    the radio turned up in the suspected drug dealer's house?

9         A    Did I make a determination?  No.

10        Q    Did you ever or did anybody to your knowledge ever

11   ask Officer McCrorey about any connections he might have had

12   with this suspected drug dealer?

13        A    I don't know.

14        Q    Okay.  Did you consider that to be an -- the fact

15   that the radio was found in a suspected drug dealer's house

16   to be an aggravating circumstance at all?

17        A    I don't understand what you mean by that.

18        Q    Well, did the fact that the radio was discovered

19   in a drug dealer's -- a suspected drug dealer's apartment

20   make you wonder if Officer McCrorey had either sold the

21   radio to him or given it to him for some reason?

22                 MR. DAIGLE:  I object to the form.  You can

23            answer.

24        A    No, I wouldn't -- I wouldn't make those kind of

25   assumptions.

1    A    I don't recall the package.

2    Q    And you don't recall whether or not the department

3    had a policy of reviewing prior disciplinary records before

4    issuing discipline?

5    A    I don't recall.

6    Q    And you don't recall whether or not the Hartford

7    police department had any established procedures for

8    progressive discipline?

9    A    I don't recall.

10    Q    Okay.  And you don't recall personally how you

11    arrived at the decision to suspend Mr. McCrorey for 12 days?

12    A    The package was prepared for me and I would have

13    reviewed that package, and based on the discipline that had

14    been agreed upon --

15    Q    But you don't recall --

16    A    I don't recall.

17    Q    -- how you came about the decision?

18    A    What was in the package, no, sir.

19    Q    And we had a little bit of a discussion the last

20    time about whether or not falsifying a police report

21    amounted to a crime, correct?

22    A    That is correct.

23    Q    And you asked me if I could provide you with the

24    statute and maybe you could refresh your recollection by

25    reviewing the statute, correct?

1    A    Yes.

2    Q    Give me a second here.

3         MR. SPEARS:  May that be marked?

4         (Plaintiff's Exhibit 15 was marked for

5         identification.)

6  BY MR. SPEARS:

7    Q    I show you what's been marked as Plaintiff's

8  Exhibit 15 and ask you to read in its entirety the paragraph

9  that's labeled 53a-180 entitled, "Falsely reporting an

10  incident."  And you have to read the whole thing because

11  it's so many sections.

12    A    Section 53 --

13    Q    No, no.  To yourself.  And then I'm going to ask

14  you questions about it.

15    A    I've read this.

16    Q    Okay.  And in speaking about Mr. McCrorey's

17  discipline where you issued him a 12-day suspension, is it

18  fair to say that he pled guilty to violating certain

19  provisions of the code of conduct?  I'll make it easier for

20  you.  Withdraw the question.  I'll give you a document that

21  will help you out.  It's already marked.

22         I show you what's been marked as Plaintiff's

23  Exhibit 6 for identification and ask you to take a look at

24  it.

25    A    Yes.

1    Q    Okay.  And, again, that would be relating to the
2  suspension that we referred to on 9 -- that's dated on
3  Plaintiff's Exhibit 10 as 9/22/99, correct?  The second from
4  the last notation.  Or is it related to this 3/23/99?  Maybe
5  it is.

6         Can you tell whether or not it's related to the
7  3/9 notation or the 3/23/99 notation on Plaintiff's
8  Exhibit 10?

9    A    They're not lined up.  I know that it says the
10  section 5.10 and 2, and then he got a 12-calendar-day
11  suspension.

12    Q    So it appears to relate to this letter?

13    A    Yes.

14    Q    And the letter is dated 3/23/99?

15    A    Yes.

16    Q    So on 9/22/99, there was a subsequent offense
17  under section 5.14, correct?

18    A    9/22/99, 5.14, yes.

19    Q    And can you again refer to 5.14 and just tell us
20  what that is again?

21    A    5.14?  Read it?

22    Q    Yes, you can read it.

23    A    "Performing assigned duties or other official work
24  in a careless or negligent manner or in disregard of
25  proscribed procedures or established practices."

1    Q    On 9/22/99, what was your position with the

2    Hartford police department?

3    A    I was employed with the police department.

4    Q    If you don't remember, I can withdraw the

5    question.  I think we have it in your affidavit anyways.

6    I'll withdraw the question.

7         Can you tell us why, after Mr. McCrorey received a

8    12-day suspension that apparently occurred from the period

9    of 8/4 -- let me find the exact dates -- apparently occurred

10   on 8/24/99 through 9/4/99, correct?

11   A    Yes.  This letter shows that he served the 12-day

12   suspension 8/24/99 through 9/4/99.

13   Q    And approximately three weeks later he was again

14   charged with another violation, correct, of the code of

15   conduct, the one you just read?

16   A    This is where I said it's not lined up that great.

17   Q    Well, there is a separate notation of 9/22,

18   correct?

19   A    It looks like 9/22/99.

20   Q    And that would have been after the suspension was

21   over, correct?

22   A    The suspension was through 9/4/99.

23   Q    Right.  And 9/22 would have been subsequent to

24   that, correct?

25   A    According to this form.

1    Q    Yes.  And it was for 5.14, which you read a moment

2  ago, correct?

3    A    Yes.

4    Q    And the indication was a written reprimand,

5  correct?

6    A    Yes.

7    Q    Why, after Mr. McCrorey had just completed a

8  12-day suspension for losing his radio, was he only given a

9  written reprimand for violation of 5.14, if you know?

10    A    I don't.

11    Q    Okay.  And then apparently subsequent to that, on

12  May 3, '00, he was accused of violating 5.08, correct,

13  according to Plaintiff's Exhibit 10?

14    A    And on 5/3/00, the charge was 5.08, correct.

15    Q    And would you refer to the code of conduct and

16  tell us what a violation of 5.08 is?

17    A    "5.08.  Negligent failure to comply with any

18  lawful orders, procedures, directives or regulations, oral

19  or written."

20    Q    Okay.  And for that he received simply an oral

21  reprimand, correct?

22    A    It says O/R, yes.

23    Q    And that stands for oral reprimand to the best of

24  your knowledge?

25    A    Yes, I believe so.

1    Q    Okay.  And can you tell us why, after just

2    finishing a 12-day suspension and just receiving a written

3    reprimand approximately eight months earlier, he only

4    received an oral reprimand?

5    A    I don't know.

6    Q    Okay.  Now, would you consider -- what do we call

7    that counseling?  Strike the question.

8         Would you consider an oral reprimand less serious

9    than documented counseling?

10    A    I don't remember.  I don't recall.

11    Q    Oral reprimand is oral, though, correct?

12    A    I would presume so, yes.

13    Q    Okay.  And documented counseling, as in the letter

14    of December 5, 1997, is a written form, correct?

15    A    In this particular instance, on December 5, 1997,

16    he was issued documented counseling.

17    Q    My only question is --

18    A    So it is in written form, in a memorandum.

19    Q    In other words, documented counseling is a written

20    form?

21    A    In this particular instance, yes.

22    Q    Do you consider or do you know if the Hartford

23    police department at the time you were there or around this

24    time considered documented counseling some form of

25    discipline?

1    A    According to this, yes.

2    Q    And is that your understanding, too?

3    A    I don't know.

4    Q    Okay.  At least Plaintiff's Exhibit 10 indicates

5    that it's a form of discipline?

6    A    According to this, that's correct.

7    Q    Okay.  And, secondly, the oral reprimand is

8    something that's not put in writing, correct?

9    A    I don't recall.

10   Q    Okay.  Doesn't the "oral" indicate that it's not

11   put in writing?

12   A    The oral says -- we agreed that O/R is oral

13   reprimand.  But whether it's put in writing or not, I

14   honestly don't remember.

15   Q    Now, it appears that Mr. McCrorey, according to

16   Plaintiff's Exhibit 10, was disciplined -- and I'll count

17   these -- 11 times.  Is that correct?

18   A    I'm sorry.  Say it again, please.

19   Q    I'm asking you how many times, according to

20   Plaintiff's Exhibit 10, was Mr. McCrorey disciplined?

21   A    It looks like 12.

22   Q    Twelve.  Okay.  Good.  Now, according to

23   Plaintiff's Exhibit 10, how many times did he receive a

24   discipline greater than either documented counseling or a

25   written reprimand?

1      A      Greater than?

2      Q      Yes.

3      A      I'm sorry.  I don't know what you mean by "greater

4    than."

5      Q      What I meant was a form of discipline more severe

6    than a documented counseling or written reprimand.

7      A      Okay.  I see a 12-calendar-day suspension on this

8    particular exhibit.

9      Q      And that appears to you to be the most strenuous

10   form of discipline that appears on Plaintiff's Exhibit 10,

11   correct?

12     A      Yes.

13     Q      Okay.  And subsequent to that 12-day suspension,

14   he received one written reprimand and one oral reprimand

15   pursuant to Plaintiff's Exhibit 10?

16     A      I see two written reprimands and one oral

17   reprimand.

18     Q      I was asking subsequent to the 12-day suspension.

19     A      Oh, after?

20     Q      After, yes.

21     A      Yes.  I see one W/R and one O/R.

22     Q      One W/R, written reprimand; one O/R, oral

23   reprimand?

24     A      That's correct.

25     Q      Can you tell me why the discipline, if you know,